UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS E. REYNOLDS, as Trustee,<br><br>                Plaintiff,<br><br>                v.<br><br>BEHRMAN BROTHERS MANAGEMENT CORPORATION,<br><br>                Defendant. | Case No.<br><br>**COMPLAINT** |

Thomas E. Reynolds (the "Trustee"), in his capacity as Chapter 7 Trustee of the bankruptcy estates of Atherotech Holdings, Inc. ("Holdings") and Atherotech, Inc. ("Atherotech" and together with Holdings, collectively "Debtors"), by his undersigned counsel, hereby alleges his Complaint against the defendant, Behrman Brothers Management Corporation, as follows:

## PARTIES

1. Holdings is a corporation organized and existing under the laws of the State of Delaware with its former headquarters and principal place of business in Jefferson County, Alabama.

2. Atherotech is a corporation organized and existing under the laws of the State of Delaware with its former headquarters and principal place of business in Jefferson County, Alabama.

3. The Trustee is the duly appointed Chapter 7 trustee of the Debtors' bankruptcy estates. The Debtors' bankruptcy estates were filed and are pending in the U.S. Bankruptcy Court for the Northern District of Alabama.

4. Behrman Brothers Management Corporation ("Behrman Management") is organized and existing under the laws of the State of Delaware, and can be served with process on

its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  At all times relevant, Behrman Management's principal place of business was and is in New York, New York.

## VENUE AND JURISDICTION

5.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as there is complete diversity among the parties.  The Debtors' bankruptcies are pending in Alabama, and the Trustee is a citizen of Alabama.  The Defendant is a citizen of New York and Delaware.  The amount in controversy exceeds $75,000.00.

6.  This Court also has subject-matter jurisdiction under 28 U.S.C. § 1334(b), as this case relates to a pending bankruptcy under title 11 of the United States Code.

7.  Venue is proper in this Court because the Defendant's principal place of business is in New York, New York.

## FACTS

**A.     The Debtors' Bankruptcy**

8.  On March 4, 2016 (the "Petition Date"), Atherotech commenced case number 16-00909-TOM7, and Holdings commenced case number 16-00910-TOM7 (collectively, the "Bankruptcy Cases") by filing voluntary Chapter 7 petitions in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court").

9.  The Bankruptcy Court appointed the Trustee as the Chapter 7 trustee for each of the Bankruptcy Cases.

10.  The Trustee is vested with the authority to bring this action on behalf of the Debtors' estates.

11.  Numerous lenders have claims against the Debtors' estates.

**B.     Debtors' Acquisition by a Private Equity Group and Behrman' Management's supervision over Debtors.**

12.    Prior to commencing its Bankruptcy Case, Atherotech operated a specialty laboratory that tested blood cholesterol levels using licensed technology known as the "VAP Test." Atherotech's principal laboratory was located in Birmingham, Alabama.

13.    On or about December 23, 2010, a New York private equity group doing business as "Behrman Capital" acquired the Debtors. In this transaction, a Behrman Capital entity, Behrman Capital Fund IV, LP ("Fund IV"), acquired approximately 94 percent of the shares in Holdings, which in turn, gave Fund IV the same percentage of ownership over Atherotech.

14.    Behrman Management is an entity under the Behrman Capital umbrella of business entities.

15.    On December 23, 2010, Holdings and Behrman Management entered into a contract (the "Management Agreement") whereby Behrman Management agreed to provide financial and operational advice to the Debtors. Independent of the contract, Behrman Management assumed responsibilities, as part of Behrman Capital's acquisition of Debtors, to provide oversight and management services, which included financial and operational directions, to the Debtors.

16.    These services included, but were not limited to, providing advice on growth and operational strategies for Atherotech and advising Atherotech on the appropriate levels of debt and equity that Atherotech should maintain. As part of the business strategic advice given to Atherotech, Behrman Management was required to take into consideration compliance with federal and state laws.

17.    In addition to the advice given, the Management Agreement delegated to Behrman Management the responsibility for making managerial and oversight decisions for the Debtors.

Behrman Management had the authority to implement strategic and operational initiatives for the Debtors. Behrman Management exercised that authority.

C. **Atherotech's business model and the payment of "P&H Fees"**

18. Atherotech marketed its VAP Test to other laboratories and directly to medical providers. When physicians would order a VAP Test for a patient, they had multiple means of collecting the sample from the patient and sending the collected sample to Atherotech for testing.

19. One means of sending the collected sample to Atherotech was through Atherotech's payment of processing and handling fees ("P&H Fees") to the physician ordering the VAP Test.

20. Generally in such an instance, Atherotech would compensate the physician $3.00 for the venipuncture – the collection of the sample – and a P&H Fee of $7.00 for the physician appropriately packaging the collected sample, and shipping the collected sample to the Debtor.

21. While Medicare rules and regulations permit the payment of the venipuncture fee, Medicare rules and regulations have long prohibited the payment of P&H Fees. Atherotech conceded the illegality of paying P&H fees following the publication of the U.S. Department of Health and Human Services ("HHS"), Office of Inspector General's ("OIG") Advisory Bulletin No. 05-08 in 2005, and soon thereafter, Atherotech stopped paying P&H fees for a number of years. However, Atherotech resumed the process of paying P&H fees in approximately 2009, not because of a change in the law, but because Atherotech's competitors began paying P&H fees.

22. When Atherotech resumed the practice of paying P&H fees, it sometimes paid P&H fees to medical providers greater than $7.00.

23. When Atherotech received the blood sample from physicians, it would test the blood sample and provide the ordering physician with a report concerning the patient's blood cholesterol.

24. For patients covered by Medicare or other federal healthcare programs, Atherotech would file a claim against Medicare or the other federal healthcare program and receive reimbursement from the government for such claims.

25. On average, Atherotech would receive revenue of approximately $140 to $150 per collected sample.

26. Starting in 2011, Behrman Management not only condoned the practice of paying P&H fees, but advised and directed Atherotech to engage in a growth strategy that was based on increasing Atherotech's direct sales to physicians. Behrman Management devised this plan with the knowledge that increasing market share would require the payment of P&H Fees to physicians on a per specimen basis, thus increasing the contingent liabilities of Atherotech.

27. Prior to devising this plan, Behrman Management knew or should have known that Atherotech had actually stopped paying P&H fees for a number of years due to the company's recognition that P&H fees were likely illegal.

D.  **The DOJ Investigation**

28. On or before September 7, 2012, the Department of Justice (the "DOJ") began an investigation regarding Atherotech's business activities.

29. Specifically, the DOJ was investigating (a) whether Atherotech's payments to physicians were kickbacks to induce physicians to order the VAP Test from Atherotech in violation of the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b), and (b) whether Atherotech had submitted false claims against Medicare or other federal healthcare programs for medically unnecessary tests in violation of the False Claims Act (31 U.S.C. §§3729-3730).

30. Violations of the False Claims Act include treble damages, that is three times the amount of the false or fraudulent claim; and a penalty of not less than $5,500 and not more than $11,000 for each claim.

31. Despite receiving notice of the DOJ investigation, Behrman Management advised and directed Atherotech to continue its efforts to increase direct sales to physicians and to continue the practice of paying physicians P&H fees. Behrman Management continued giving this advice to Atherotech until June 2014.

32. From January 2011 through June 2013, Medicare reimbursed Atherotech approximately $44,539,000 for tests that Atherotech had run.

33. Approximately 80 percent of these tests were associated with Atherotech's payment of P&H Fees to the ordering physician.

34. Thus, as of June 2013, Debtors had approximately $35,691,000 in contingent liability associated with the repayment of these Medicare reimbursements under the False Claims Act, which equates to approximately $107,073,000 in contingent liabilities taking into account treble damages under the False Claims Act.

E. **The Dividend Recapitalization**

35. Behrman Management devised a scheme to issue a dividend recapitalization (the "Dividend Recap") with the primary purpose of issuing a dividend to Fund IV's Limited Partners. At the time the Dividend Recap was launched, Behrman Management knew about the DOJ investigation of Atherotech and Atherotech's contingent liability under the False Claims Act, and this plan was implemented with the goal of paying a dividend to the Fund IV limited partners prior to the DOJ taking action against Atherotech and other specialty lab companies.

36. Behrman Management led all aspects of the Dividend Recap. Behrman Management led the efforts to secure the lenders to fund the dividend. Behrman Management worked directly with all the professional service providers, including law firms, needed to close the Dividend Recap, and the company's representatives were the key contacts with those service providers.

37. Behrman Management provided the necessary paperwork for Atherotech to sign to approve the Dividend Recap. Behrman Management requested that Atherotech's officers and its one director sign the necessary paperwork for the dividend recapitalization. Atherotech's officers acquiesced to these requests.

38. Behrman Management led the process of contacting potential lenders to finance the dividend recap. Behrman Management organized a process in which lenders submitted proposals to Behrman Management, not to Atherotech, regarding the amounts and terms under which the lenders would fund the dividend.

39. In an effort to secure the largest dividend possible, Behrman Management obtained a solvency opinion (the "Solvency Opinion") from Houlihan Lokey, Inc. ("HL"). Behrman Management controlled the information provided to HL for HL's use in preparing the Solvency Opinion.

40. The Solvency Opinion did not include any information concerning the potential liabilities associated with payment of P&H fees or Atherotech's practice of paying P&H fees. Nor did it include any contingent liabilities in the calculation of Atherotech's equity value. Behrman Management either intentionally or recklessly withheld from HL the existence of the contingent liabilities associated with potential exposure to the federal government based on the payment of P&H fees.

41. Also, Behrman Management provided HL with certain financial data and projections about Atherotech. Atherotech's projections, however, did not include any changes to its business processes that might result from the inability to pay P&H Fees. The withholding of this information resulted in HL's Solvency Opinion being fundamentally flawed.

42. On June 28, 2013, Atherotech executed that certain Credit Agreement (the "Credit Agreement") by and between Atherotech as borrower, and Madison Capital Funding, LLC as agent for the lenders (the "Lenders").

43. Pursuant to the Credit Agreement, the Lenders agreed to make a term loan to Atherotech in the original principal amount of $40.5 million.

44. As security for Atherotech's obligations under the Credit Agreement, Atherotech granted the Lenders a security interest and lien on essentially all of Atherotech's assets.

45. Atherotech paid the dividend on June 28, 2013, principally from funds borrowed under the Credit Agreement.

46. None of Holdings' Shareholders provided the Debtors with any consideration for the portion of the dividend that they received.

47. At the end of June 2014, immediately after the $33,000,000 Dividend Recap, Atherotech had total assets with a book value of $45,244,096, and total liabilities with a book value of $51,045,820.

48. At the end of June 2013, 45 percent of Atherotech's assets were intangible (i.e., goodwill, customer relationships, licenses, and patents).

49. At the time of the Dividend Recap, Atherotech – having assets of only $45,244,096 – could not pay its liabilities, including the unrecorded contingent liabilities of $107,073,000 for violations of the False Claims Act, as they became due. The Dividend Recap left Atherotech with

so little cash available that it could not make payroll following the transaction, and Atherotech was forced to tap into a line of credit in order to pay its employees. Atherotech was insolvent.

50. Behrman Management directed and orchestrated the Dividend Recap when they were aware that Atherotech was under investigation by the DOJ and had unrecorded contingent liabilities of $107,073,000 for its violations of the False Claims Act. Behrman Management oversaw the financial operations and financial reporting for Atherotech, and they devised the scheme to issue the Dividend Recap with knowledge that Atherotech should have recorded the contingent liabilities resulting from paying P&H fees.

51. Behrman Management failed to advise Atherotech on the detrimental financial effects the Dividend Recap would have on the company, including making the company even more insolvent. Behrman Management both failed to advise Atherotech on, and failed to implement, a much smaller dividend that would not have left Atherotech in an untenable financial position. In orchestrating the Dividend Recap, Behrman Management knew that the transaction would result in Atherotech having inappropriate levels of debt to equity. Behrman Management failed to provide Atherotech with any analysis as to what levels of debt to equity would be appropriate for Atherotech, contrary to Behrman Management's obligations under the Management Agreement.

52. In addition, Behrman Management had a conflict of interest in terms of serving Fund IV's limited partners, all while having obligations to advise and make decisions in Atherotech's best interest. Behrman Management devised and implemented the Dividend Recap with the goal of providing Fund IV's limited partners with as high a return on their investment as possible, all while recklessly or knowingly disregarding the financial health of Atherotech. Behrman Management failed to advise Atherotech that the Dividend Recap was being orchestrated for the benefit of Fund IV's limited partners and at the detriment of Atherotech.

**F.     The OIG Fraud Alert**

53.     The business growth plan developed by Behrman Management proved detrimental to Atherotech.

54.     On June 25, 2014, the OIG issued that certain *Special Fraud Alert: Laboratory Payments to Referring Physicians* (the "Fraud Alert").

55.     The Fraud Alert confirmed HHS's long-standing position that P&H Fees paid to physicians were incentives or inducements that were illegal and violated the Anti-Kickback Statute and the Civil False Claims Act.

**G.     Atherotech's Financial Collapse**

56.     By July 2014, just a little over a year after the Dividend Recap, Atherotech was no longer able to pay P&H Fees.

57.     Consequently, Atherotech's revenues decreased significantly due to the removal of this incentive for doctors to promote Atherotech tests for their patients.

58.     Behrman Management was tasked with leading Atherotech at the time the 2014 fraud Alert was issued.  Behrman Management failed to have a contingency plan in place to navigate through the OIG's decision, even though it not only expected that the OIG would issue this opinion years in advance, it was the very outcome that Behrman Management hoped would come to fruition as early as 2011.

59.     As a consequence of Behrman Management's failure to employ a contingency plan, Behrman Management was forced to scramble to put together a series of haphazard, and ultimately unsuccessful, attempts to keep Atherotech's direct business with physicians. Behrman Management devised and implemented a plan to increase efforts to put phlebotomists in doctor's offices, but this process proved costly.  Behrman Management failed to employ this strategy with

any foresight as to how to make this process beneficial from a cost/revenue basis. As a result, the increase of in-office phlebotomists failed and led to significant financial outlays.

60. In addition, Behrman Management instituted a plan to change Atherotech's direct billings. This idea was put together and implemented without the most basic levels of operational planning, including the failure to create a communications strategy to customers explaining why the billings needed to be changed. Behrman Management was grossly negligent by launching this program without devising strategies to deal with known risks, such as the angst that it would cause customers. As a result, this billing change cost Atherotech additional customers. Behrman Management devised and implemented this initiative without proper consideration. As one of the members of Behrman Management admitted, this change in billing initiative was "a disaster", and this poorly devised plan further highlights Behrman Management's failure to devise and implement a contingency plan in place when the market changed as a result of the 2014 Fraud Alert.

61. Behrman Management's failure to comply with its obligation to provide sound business advice and management services continued up to the eve of Atherotech's bankruptcy filing in March 2016.

## FIRST CLAIM FOR RELIEF
### Breach of Contract

62. The Trustee adopts and incorporates all the previous paragraphs in this Complaint as if fully stated herein.

63. Atherotech and Behrman Management entered into a contract, the Management Agreement, whereby Behrman Management agreed to serve as Atherotech's financial and operational advisor. Behrman Management also agreed to effectively manage and oversee Atherotech's operations.

11

64. Behrman Management breached the Management Agreement by willfully failing to provide reasonable and sound business advice. Behrman Management failed to advise Atherotech regarding the appropriate levels of debt and equity that Atherotech should maintain. Behrman Management breached the Management Agreement by directing Atherotech to pay out as a dividend in 2013 an amount that left the company insolvent and threatened Atherotech's ability to be a long-term going concern. Behrman Management breached the Management Agreement by placing the interests of Fund IV's limited partners above the interests of Atherotech.

65. Had Behrman Management not consummated the dividend, Atherotech's debt to equity levels would have remained stable enough to enable the company to weather changes in the market, including the cessation of paying P&H fees that resulted following the OIG's 2014 fraud alert.

66. Behrman Management breached the Management Agreement by taking actions such as effectuating the dividend recapitalization that benefited the interests of the Fund IV limited partners to the detriment of Atherotech. Behrman Management knew that the dividend recapitalization would financially cripple Atherotech, and Behrman Management recklessly disregarded Atherotech's interests when it exercised its authority to consummate the dividend on behalf of Fund IV.

67. Behrman Management also breached its contract by advising Atherotech to engage in a business strategy that would increase the company's payments of P&H fees, which were illegal kickbacks to physicians. Moreover, Behrman Management breached its contractual duties by failing to advise the company to change its business practices even when the government notified Atherotech in September 2012 that it was being investigated for possible kickback payments to physicians. Behrman Management continued advising Atherotech to continue with the business

model that required the payment of P&H fees until July 2014. Behrman Management further breached its duty to Atherotech by failing to create and implement a reasonable strategy to respond to the changing competitive landscape that was created by the 2014 Fraud Alert.

68. Behrman Management's failure to plan and implement sound business strategies was done with a willful disregard for Atherotech's interests.

69. As a proximate cause of Behrman Management's multiple breaches of its contractual obligations, Atherotech was forced to file for Chapter 7 bankruptcy in March 2016. But for Behrman Management's failure to comply with its obligations to Atherotech, including the obligation to implement and oversee sound business strategies, Atherotech would have been able to remain a going concern. As a result of Behrman Management's breaches, Atherotech suffered damages in the form of lost profits and exposed the company to avoidable liabilities, including unnecessary legal expenses and exposure to the federal government.

## SECOND CLAIM FOR RELIEF
**Willful and Grossly Negligent Conduct**

70. The Trustee adopts and incorporates all the previous paragraphs in this Complaint as if fully stated herein.

71. As Atherotech's financial and operational advisor, Behrman Management had a duty to provide reasonable and sound advice to Atherotech regarding its business practices.

72. Behrman Management breached its common law duties to Atherotech by willfully failing to provide reasonable and sound business advice. Behrman Management acted in a grossly negligent manner.

73. Behrman Management breached its duty in failing to advise Atherotech regarding the appropriate levels of debt and equity that Atherotech should maintain.

74. Behrman Management breached its duties to Atherotech by encouraging Atherotech to pay out the Dividend whereby Atherotech became more insolvent and threatened Atherotech's ability to be a long-term going concern.

75. Behrman Management also breached its duty to Atherotech by advising Atherotech to engage in a business strategy that would increase the company's payments of P&H Fees, which were illegal kickbacks to physicians. Behrman Management continued this advice from 2010 to June 2014.

76. Moreover, Behrman Management breached its duties to Atherotech by failing to have Atherotech change its business practices when the DOJ notified Atherotech in September 2012 that it was being investigated for possible kickback payments to physicians.

77. Behrman Management further breached its duty to Atherotech by failing to create and implement a reasonable strategy to respond to the changing competitive landscape that was created by the 2014 Fraud Alert. Behrman Management failed to have a contingency plan in place in order to respond to the anticipated 2014 Fraud Alert, and the initiatives advanced by Behrman Management were hastily put together in disregard of the most basic decision-making processes. Moreover, Behrman Management was negligent in advising Atherotech to change its billings practices in 2015, which led to further financial harm to the Debtors.

78. As a proximate cause of Behrman Management's multiple breaches of its duty to provide sound and reasonable advice to Atherotech, Atherotech was forced to file for Chapter 7 bankruptcy in March 2016.

79. As a result of Behrman Management's breaches, Atherotech suffered damages in the form of lost profits and exposed the company to avoidable liabilities, including unnecessary legal expenses and exposure to the federal government.

## THIRD CLAIM FOR RELIEF
**Breach of Fiduciary Duty**

80. The Trustee adopts and incorporates all the previous paragraphs in this Complaint as if fully stated herein.

81. As Atherotech's financial and operational advisors, Behrman Management had a fiduciary duty to Atherotech to provide the company with financial and business advice that was in Atherotech's best interest.

82. Behrman Management breached its fiduciary duty to Atherotech. Behrman Management breached its duty in failing to advise Atherotech regarding the appropriate levels of debt and equity that Atherotech should maintain. Behrman Management breached its duty to Atherotech by encouraging Atherotech to pay out as a dividend in 2013 an amount that left the company insolvent and threatened Atherotech's ability to be a long-term going concern.

83. Behrman Management also breached its duty to Atherotech by advising Atherotech to engage in a business strategy that would increase the company's payments of P&H fees, which were illegal kickbacks to physicians. Moreover, Behrman Management breached its duties to Atherotech by failing to advise the company to stop paying P&H fees when the government notified Atherotech in September 2012 that it was being investigated for possible kickback payments to physicians.

84. As a proximate cause of Behrman Management's multiple breaches of its fiduciary duties, Atherotech was forced to file for Chapter 7 bankruptcy in March 2016. As a result of Behrman Management's breaches, Atherotech suffered damages in the form of lost profits and exposed the company to avoidable liabilities, including unnecessary legal expenses and exposure to the federal government.

WHEREFORE, the Trustee respectfully requests that this Court:

A.  Enter judgment in favor of the Trustee and against Defendant, in an amount to be proven at trial;

B.  Award direct and, if applicable, consequential, incidental, and punitive damages in an amount to be determined at trial;

C.  Award costs and attorneys' fees, as provided by law or under the contract; and

D.  Grant such other further relief as this Court deems just and equitable.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff respectfully demands trial by jury on all claims and issues so triable.

Dated: June 21, 2019 in New York, New York

**BARTON LLP**

By: _____
Roger E. Barton
Eric W. Sleeper
Randall L. Rasey

711 Third Avenue, 14th Floor
New York, New York 10017
rbarton@bartonesq.com
esleeper@bartonesq.com
rrasey@bartonesq.com
(212) 687-6262

-and-

Christina M. Bolin
Bill D. Bensinger (pro hac vice to be submitted)
Richard E. Smith (pro hac vice to be submitted)
Jonathan W. Macklem (pro hac vice to be submitted)
**CHRISTIAN & SMALL, LP**
1800 Financial Center
505 North 20th Street

Birmingham, Alabama 35203
cmb@csattorneys.com
bdb@csattorneys.com
res@csattorneys.com
jwm@csattorneys.com
(205) 250-6626

*Attorneys for Plaintiff Thomas E. Reynolds, as Trustee*


Birmingham, Alabama 35203
cmb@csattorneys.com
bdb@csattorneys.com
res@csattorneys.com
jwm@csattorneys.com
(205) 250-6626

*Attorneys for Plaintiff Thomas E. Reynolds, as Trustee*