UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                     :
THOMAS E. REYNOLDS, AS TRUSTEE,       :
                                    Plaintiff,    :        19 Civ. 5842 (LGS)
                                                     :
                    -against-                  :        **OPINION AND ORDER**
                                                     :
BEHRMAN BROTHERS MANAGEMENT           :
CORPORATION,                               :
                                   Defendant.  :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

       Plaintiff, Thomas E. Reynolds, the Chapter 7 Trustee of Atherotech Holdings, Inc.

("Holdings") and Atherotech, Inc. ("Atherotech") (together, "Debtors"), bring this breach of

contract action against Debtors' former financial advisor, Defendant Behrman Brothers

Management Corporation ("BBMC").  Defendant moves to dismiss the Amended Complaint (the

"Complaint")[1] on grounds that: (1) the Complaint fails to identify any contract provision

Defendant breached, (2) the alleged misconduct is subject to an exculpation clause, (3) the

Complaint fails to plead damages, and (4) the claims are time barred.  For the reasons below,

Defendant's motion to dismiss is granted.  Plaintiff may seek leave to amend consistent with this

Opinion.

---

[1] The operative Amended Complaint was filed on December 17, 2019, after the motion to
dismiss was fully briefed.  Because the Amended Complaint does not make any changes material
to the motion, the parties agreed -- and the Court so-ordered -- that the motion be construed to
apply to the Amended Complaint.  *See* Order at Dkt. No. 38.

I.      BACKGROUND

        The following facts are taken from the Complaint, documents integral to or incorporated

in the Complaint by reference, and materials of which judicial notice may be taken, and these

facts are accepted as true for purposes of this motion only.[2]  *See Goel v. Bunge, Ltd.*, 820 F.3d

554, 559 (2d Cir. 2016); *accord St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, No. 18 Civ. 1148, 2019

WL 4601720, at *3 (S.D.N.Y. Sept. 23, 2019).

        A.      **The Financial Advisor Agreement**

        Atherotech was a medical diagnostics company that, among other things, developed a

blood cholesterol test called the "VAP Test."  Holdings was Atherotech's parent company.  On

December 23, 2010, Behrman Capital Fund IV, LP ("Fund IV"), a private equity fund of non-

party Behrman Capital, acquired a 94% ownership stake in Holdings, and in turn, Atherotech.

That same date, Holdings and Defendant BBMC, another Behrman Capital entity, entered into

the "Financial Advisor Agreement" (the "Agreement") -- the subject of this dispute.  The

Agreement is expressly governed by New York law.

        Under Section 1 of the Agreement, Defendant agreed "to provide [advisory] services" to

Debtors on various issues, including: "management advisory services . . . in connection with . . .

growth strategies, operational strategies, business partnership strategies" (§ 1(a)(i)(A));

"reviewing and approving annual financial budgets" (§ 1(a)(i)(F)); "[a]dvising [Debtors] on all

aspects of their capital structure, including appropriate levels of debt and equity, which may

include . . . sourcing, arranging and structuring debt and equity financing for [Debtors and] . . .

advising [Debtors] with respect to appropriate cash management practices (§§ 1(a)(ii)(B)-(D)).

---

[2] In support of the motion, Defendants filed full copies of the Agreement at issue and a copy of
the United States Department of Health and Human Services' Special Fraud Alert.  Both of these
are integral to and incorporated into the Complaint.

The Agreement provides further that Defendant "will devote such time and effort in providing the services contemplated hereby as it deems reasonably necessary or appropriate; provided, that . . . [Defendant] reserves the right at any time not to provide services hereunder" (§ 1(b) (emphasis in original)).

Under Section 13 of the Agreement, in a provision entitled "Indemnification; Contribution," Holdings:

> agrees to indemnify and hold harmless [Defendant] and its affiliates [each of which is an "Indemnified Party"] . . . from and against . . . any action, claim, proceeding or investigation . . . whether or not such Indemnified Party is a party and whether or not such action, claim, litigation, proceeding or investigation is initiated or brought by the Company [Holdings]. . . . . The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company related to or arising out of [BBMC's] retention pursuant to or performance of the services contemplated by this Agreement, except to the extent that the Advisor's conduct in connection with such retention or performance is found in a final, non-appealable judgment by a court of competent jurisdiction to have constituted willful misconduct or gross negligence.

(§ 13(a)).

## B.   Alleged Breaches

The Complaint alleges that Defendant breached the Agreement in three ways, by: (1) advising Atherotech to employ a growth strategy that depended on the payment of illegal process and handling fees ("P&H Fees") to physician customers, (2) orchestrating a June 28, 2013, Dividend Recapitalization ("Dividend Recap"), to benefit Defendant-affiliated shareholders of Atherotech, before Atherotech faced liability for P&H Fees, and (3) failing to devise a contingency plan for Atherotech's business after it was forced to stop paying P&H Fees in July 2014.  Defendant's actions contributed to the company's eventual financial collapse.  Debtors filed voluntary Chapter 7 bankruptcy petitions in March 2016.

With respect to growth strategy, Atherotech's business model included paying P&H Fees to physician customers. The fees covered the costs of physicians' packaging and mailing patient blood samples to Atherotech's laboratory, where Atherotech then performed the VAP Tests. Around 2005, Atherotech stopped paying P&H Fees, because it "conceded [their] illegality" in light of United States Department of Health and Human Services ("HHS") guidance. But around 2009, Atherotech resumed paying the fees, because its competitors were doing so. In 2011, Defendant advised Atherotech to grow its business by increasing direct sales to physicians. Defendant knew the strategy relied on P&H Fees and would "increas[e] the contingent liabilities of Atherotech." The Department of Justice ("DOJ") in 2012 began investigating whether Atherotech's P&H Fees violated anti-kickback laws and the False Claims Act. As of June 2013, Debtors had approximately $35,691,000 in contingent liability associated with the possible repayment of Medicare reimbursements under the False Claims Act, subject to trebling for a total of approximately $107 million. On June 25, 2014, HHS issued a "Special Fraud Alert, Laboratory Payments to Referring Physicians" (the "Fraud Alert"). The Fraud Alert stated that commercial payments to physicians, for handling and mailing blood samples, are prohibited "if even one purpose of the payment is to induce or reward referrals of Federal health care program business." Because Medicare reimburses physicians for blood sample handling, the additional fees are more likely to have an "illegitimate purpose." From 2011 to 2014, while Defendant was advising Atherotech, a substantial portion of the company's blood samples qualified for Medicare reimbursement.[3] In July 2014, Atherotech stopped paying P&H Fees.

---

[3] According to the Complaint, Atherotech itself filed Medicare claims and received reimbursement related to the blood samples, rather than the physicians who handled and mailed in blood samples. The Special Fraud Alert describes only the practice of physicians seeking Medicare reimbursement and also being paid by a clinical laboratory for services. The

The Complaint also alleges that the Dividend Recap, which closed during the DOJ investigation on June 28, 2013, breached the Agreement.  Defendant allegedly launched the transaction "with the goal of paying a dividend to the Fund IV limited partners prior to the DOJ taking action against Atherotech."  In a dividend recapitalization, a company incurs debt to pay dividends to shareholders, with the effect of increasing a company's debt to equity ratio. Defendant directed Atherotech to take on an untenable level of debt to maximize the dividends paid to Fund IV partners.  Defendant controlled every aspect of the transaction, including, critically, obtaining a "Solvency Opinion" concerning Atherotech from an investment banking firm, to ensure that Atherotech received the largest loan possible.  Although Defendant was aware that Atherotech faced significant contingent liabilities for P&H Fees, Defendant withheld this information from the opinion issuer.  As a result, the Solvency Opinion did not discuss or consider any contingent liabilities.  The Complaint asserts that, at the time of the Dividend Recap, the company was insolvent with contingent liabilities of $107 million and assets of only $45 million.  Defendant was aware of this figure because it monitored Atherotech's financial records.  Ultimately, the Dividend Recap left Atherotech with assets of only about $45 million and liabilities (not including the contingent liabilities) of $51 million.  The company could not afford to pay employee salaries and tapped into a line of credit to do so.  Defendant's actions were reckless because Defendant "disregard[ed] the financial health of Atherotech" at the same time that it had a conflict of interest as both an advisor to Atherotech and a party affiliated with the dividend beneficiaries.

---

Complaint does not discuss how this difference in Medicare billing might bear on Atherotech's exposure under the Special Fraud Alert.

The Complaint also challenges Defendant's failure to devise a business contingency plan after Atherotech stopped paying P&H Fees in July 2014. Defendant knew years in advance that these fees would be curtailed, yet purposefully steered Atherotech to a business strategy that depended on these fees. After July 2014, Debtors scrambled to maintain direct sales, but their haphazard strategies were unsuccessful. Defendant attempted to implement direct billing of Atherotech's customers as a way to maintain sales, but it did not plan in advance how it would execute this strategy. As a result, the strategy was "a disaster" and caused Atherotech to lose customers.

## II.   LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, *Montero v. City of Yonkers*, 890 F.3d 386, 391 (2d Cir. 2018), but gives "no effect to legal conclusions," *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)) (internal quotation marks omitted). The Complaint asserts a single cause of action for breach of the Agreement. This claim is governed by New York law, pursuant to the Agreement's explicit choice-of-law provision. *See*

*TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*, No. 19 Civ. 3283, 2020 WL 1322872, at *7
(S.D.N.Y. Mar. 20, 2020) (A New York federal court must apply New York choice-of-law rules,
which "'generally enforce[]' '[c]ontractual choice of law provisions.'" (quoting *Arnone v.
Aetna Life Ins. Co.*, 860 F.3d 97, 108 (2d Cir. 2017)).  New York law applies for the additional
reason that the parties assume that it does.  *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31
(2d Cir. 2017) (Where the "parties' briefs assume that [a given] state law governs . . . such
implied consent . . . is sufficient to establish the applicable choice of law.").

"At the motion to dismiss stage, a district court may dismiss a breach of contract claim
only if the terms of the contract are unambiguous," *Orchard Hill Master Fund Ltd. v. SBA
Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016), and inconsistent with the plaintiff's claim.
"A contract is unambiguous if the language it uses has 'a definite and precise meaning,
unattended by danger of misconception in the purport of the [agreement] itself, and concerning
which there is no reasonable basis for a difference of opinion.'"  *Williams v. Town of Carmel*,
106 N.Y.S.3d 333, 335 (2d Dep't 2019) (quoting *Greenfield v. Philles Records, Inc.*, 780 N.E.2d
166, 170 (N.Y. 2002)) (alteration in original).  Courts assess ambiguity using the "normal rules
of contract interpretation: words and phrases should be given their plain meaning and a contract
should be construed so as to give full meaning and effect to all of its provisions."  *Orchard Hill
Master Fund Ltd.*, 830 F.3d at 156 (quotation marks omitted).  A court is "not obliged to accept
the allegations of the complaint as to how to construe [the contract], but at this procedural stage,"
ambiguities in the contract are to be resolved in the plaintiff's favor.  *Subaru Distribs. Corp. v.
Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005); *accord Mr. Olympia, LLC v. Ultimate
Nutrition, Inc.*, No. 17 Civ. 1346, 2018 WL 1322201, at *2 (S.D.N.Y. Mar. 13, 2018).

### III. DISCUSSION

The Complaint fails to plead a sufficient breach of contract claim on any of the three alleged theories of liability. Plaintiff may seek leave to replead only as to the Dividend Recap theory.[4]

#### 1. Interpretation of the Agreement

To plead a breach of contract claim under New York law, a plaintiff must allege: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (applying New York law; internal quotation marks omitted); *accord A.E. Rosen Elec. Co. v. Plank, LLC*, No. 528740, 2020 WL 1172614, at *1 (3d Dep't 2020). Defendant argues that the Complaint fails to plead any breach, because the Complaint does not identify any provisions that were breached and the alleged misconduct is in any case exculpated. With respect to the Dividend Recap claim, these arguments are rejected.

The Agreement in Section 13 unambiguously limits Defendant's liability "in contract" to any "willful misconduct or gross negligence" in "performance of the services contemplated by this Agreement." Thus, to plead that Defendant breached the agreement, the Trustee must allege that: (1) Defendant's services were inadequate under Section 1, which describes the standards for

---

[4] Because the Complaint alleges breach of contract as its only cause of action, and there is no dispute about the validity of the contract, the parties' arguments as to breach of the implied covenant of good faith and fair dealing are not addressed. This claim is not pleaded and in any event is redundant. *See Mariah Re Ltd. v. Am. Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 615–16 (S.D.N.Y. 2014) ("The Second Circuit has explicitly noted that 'when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant.'" (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013))), *aff'd sub nom. Maria Re Ltd. ex rel. Varga v. Am. Family Mut. Ins. Co.*, 607 F. App'x 123 (2d Cir. 2015).

some of the services Defendant provides, *and* (2) Defendant's conduct amounts to willful misconduct or gross negligence under Section 13.

Plaintiff argues, to the contrary, that Section 13 applies only to claims for which Holdings may have to indemnify Defendant, because the section is titled "Indemnification; Contribution." This argument ignores the unambiguous language of Section 13. The exculpation clause expressly applies to direct actions between Holdings and Defendant: "[N]o Indemnified Party [including Defendant] shall have any liability (whether *direct* or indirect, in contract or tort or otherwise) *to the Company* [Holdings] related to or arising out of [Defendant's] retention pursuant to or performance of the services contemplated by this Agreement" (emphasis added). Another provision in Section 13 states that Holdings agrees that it will "hold [Defendant] harmless . . . whether or not [the claim at issue] is *initiated or brought by the Company* [Holdings]" (emphasis added). Section 13 has a *separate* exculpation clause that applies expressly to indemnification, which suggests the exculpation clause at issue here is not limited to indemnification: Holdings "shall not be liable under the foregoing indemnification provision . . . to the extent that any loss, claim, damage, judgment, liability or expense . . . resulted solely from [Defendant's] willful misconduct or gross negligence in connection with any of the advice, actions, inactions or services referred to above." Immediately following this clause, Holdings then "also agrees" to the exculpation clause at issue here.

Defendant argues that the breach of contract claim must be dismissed and all theories of liability rejected, because Defendant did not guarantee any particular results or services to Atherotech. To support this argument, Defendant points to Section 1, which states that Defendant "will devote such time and effort in providing the services contemplated hereby as it deems reasonably necessary or appropriate; provided, that . . . [Defendant] reserves the right at

any time not to provide services hereunder."  But this argument misunderstands some of Plaintiff's allegations.  With respect to the Dividend Recap claim, the Complaint is not challenging the absence of Defendant's services, but rather that the services did not satisfy the standards under Section 1.  That Defendant has discretion to determine the degree of "time and effort" necessary or whether to provide advice does not excuse Defendant from ensuring that the advice it does give satisfies the other terms of the Agreement.

### 2.  Dividend Recap Claim

The Complaint does not sufficiently plead a breach of contract claim based on the Dividend Recap.  While the Complaint sufficiently pleads that: (1) Defendant breached Section 1 because the level of debt and equity it advised Debtors to take on was not "appropriate," and (2) this breach resulted from Defendant's "willful misconduct or gross negligence," the Complaint does not adequately plead damages.

### a.  Breach of the Agreement

Section 1(a)(ii)(B) provides that Defendant may advise Debtors on "their capital structure," including on the "appropriate levels of debt and equity" to maintain.  Therefore, to the extent Defendant advised Debtors on the amount of debt they should incur, that amount was required to be "appropriate."

The Complaint alleges that Defendant breached its obligation to provide advice as to "appropriate levels of debt and equity."  Generically, "appropriate" means proper under the circumstances.  How this term should be interpreted and applied in the circumstances of this case is not further defined.  But the Complaint pleads at least one plausible interpretation sufficient to withstand dismissal -- that "appropriate" means a level of debt that should not foreseeably lead to insolvency.  *See Orchard Hill Master Fund Ltd.*, 830 F.3d at 157 (a court should deny a motion

to dismiss where a contract provision is ambiguous, *i.e.* there is a "reasonable basis for a difference of opinion" as to application of the provision).  Specifically, the Complaint pleads that Defendant advised Atherotech to take on a level of debt in the Dividend Recap that Defendant knew at the time would likely result in Atherotech's insolvency.  Indeed, the Complaint alleges that Defendant's strategy was to drive Atherotech to take on inappropriate levels of debt but ensure that Defendant first extracted "the largest dividend possible" for Defendant-affiliated shareholders.

The Complaint also sufficiently alleges that Defendant acted willfully or with gross negligence.  Gross negligence is "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing."  *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir. 1996) (quotation marks omitted) (applying New York Law to interpret exculpatory language permitting liability for "gross negligence or willful misconduct").  Although Defendant knew Atherotech's business model heavily depended on P&H Fees, knew about the ongoing DOJ Investigation, and knew about Atherotech's significant exposure, it did not report any of this information in obtaining what was an unreliable Solvency Opinion.  This opinion in turn facilitated Atherotech's assuming debt it did not have the capacity to repay.  Furthermore, Defendant's actions were focused only on the benefit to Fund IV partners and disregarded Atherotech's interests.  The greater the debt that Atherotech incurred, the greater the dividends paid to Fund IV partners.  Although the Complaint does not allege the identities of the Fund IV partners, it alleges that Defendant had a vested interest in the performance of Fund IV, because both Defendant and the fund were under the Behrman Capital umbrella.

Defendant counters that Section 1 does not impose any "*affirmative* contractual obligation to provide the advice the Trustee now claims was *not* provided" as to the levels of

11

debt and equity Atherotech should have maintained.  The claim, however, as discussed, is not that Defendant failed to provide advice, but that the advice was not "appropriate," and that it was willful and in reckless disregard of Atherotech's interests.  Defendant also argues that the contract does not require that its advice produce particular results, but for the same reason, this argument is also beside the point.  Similarly, Defendant's arguments that Atherotech's financial collapse cannot be traced back to Defendant's actions is irrelevant for the same reasons, and in any case raises factual disputes not proper for consideration at this stage.

### b.  Damages

The Complaint does not sufficiently plead damages as to the Dividend Recap claim.  The Complaint seeks damages in the form of lost profits and avoidable liabilities, based on the theory that, but for Defendant's willful or grossly negligent advice on "appropriate" levels of debt and equity, Atherotech would have been able to remain a going concern.  These damages are insufficiently pleaded, and Plaintiff may seek leave to replead damages on the Dividend Recap claim *only*.

Lost profits and similar damages that do not flow directly from the breach are "special" or consequential damages.  *See Yenrab, Inc. v. 794 Linden Realty, LLC*, 68 A.D.3d 755, 759, 892 N.Y.S.2d 105, 110 (2d Dep't 2009).  To plead consequential damages, a complaint must allege that "the damages were foreseeable and within the contemplation of the parties at the time the contract was made."  *Id*. (quotation marks omitted); *accord Atkins Nutritionals, Inc. v. Ernst & Young, LLP*., 301 A.D.2d 547, 549, 754 N.Y.S.2d 320 (2d Dep't 2003); *Sprayregen v. Mangiameli*, No. 14 Civ. 6419, 2016 WL 264934, *4 (E.D.N.Y. 2016).  "This standard rests on an evaluation of what liability is foreseeable" and also on what "'fairly may be supposed to have assumed consciously' by the defendant given the circumstances of the contract."  *Schonfeld v.*

*Hilliard*, 62 F. Supp. 2d 1062, 1072 (S.D.N.Y. 1999) (quoting *Kenford Co. v. Cty. of Erie*, 537

N.E.2d 176, 176 (N.Y. 1989)), *aff'd in part, rev'd in part on other grounds*, 218 F.3d 164 (2d

Cir. 2000); *accord Awards.com, LLC v. Kinko's, Inc.*, 834 N.Y.S.2d 147, 153 (1st Dep't 2007),

*aff'd*, 925 N.E.2d 926 (N.Y. 2010) (finding it "highly speculative and unreasonable to infer [an

intent] to assume the risk of lost profits" where defendant entered a licensing agreement with

plaintiff, a start-up company "with an untested concept").

 As to the foreseeability element, the Complaint contains allegations that insolvency and

the company's ultimate demise were a foreseeable consequence of Defendant's failure to provide

advice on "appropriate" levels of debt and equity.  But the Complaint does not allege that

Defendant assumed -- or that Plaintiff reasonably believed Defendant assumed -- the risk of

resulting lost profits or other consequential damages when the contract was made.  The

Agreement does not allocate responsibility for these damages, and the Complaint does not allege

any facts creating an inference that "the parties, at any relevant time, reasonably contemplated or

would have contemplated" that Defendant "was undertaking a contractual responsibility" for the

risk of these damages.  *See Kenford*, 537 N.E.2d at 179.

 The Complaint also seeks to recoup the contractual management fee paid to Defendant,

alleging that Atherotech "did not receive the benefit of the management fee paid."  However,

benefit-of-the-bargain damages seek to make the injured party whole, and "the injured party

should not recover more from the breach than he would have gained had the contract been fully

performed."  *Terwilliger v. Terwilliger*, 206 F.3d 240, 248 (2d Cir. 2000) (quoting *Freund v.

Washington Square Press, Inc.*, 314 N.E.2d 419, 420–21 (N.Y. 1974)).  To the extent the

Complaint is requesting rescissory damages, such damages are also not adequately pleaded.

"Rescissory damages are the financial equivalent of rescission," and may be awarded where

rescission of a contract is warranted yet "impractical." *See Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, 935 N.Y.S.2d 858, 869–70 (Sup. Ct. 2012). "Under New York law, it has long been established that, in order to justify the remedy of rescission, a breach of contract must be 'material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.'" *See Kriegel v. Donelli*, No. 11 Civ. 9160, 2014 WL 2936000, at *15 (S.D.N.Y. June 30, 2014) (quoting *Callaman v. Powers, et al.*, 92 N.E. 747 (N.Y. 1910)). As an equitable remedy, rescission "will not be granted unless plaintiff lacks an adequate remedy at law." *C3 Media & Mktg. Grp., LLC v. Firstgate Internet, Inc.*, 419 F. Supp. 2d 419, 435 (S.D.N.Y. 2005) (applying New York law). Rescission of a contract may be impractical where "the subject of the contract sought to be rescinded no longer exists, or is otherwise impossible or impractical to recover." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 963 N.Y.S.2d 21, 22 (1st Dep't 2013).

The Complaint may have sufficiently alleged that the breach is material -- Defendant's willful or reckless advice on "appropriate" levels of debt and equity resulted in the Company's insolvency -- and that such breach defeats the object of the contract -- Defendant "devised" the Dividend Recap to serve the fund's limited partners contrary to Defendant's obligations under the Agreement. However, the Complaint does not allege that rescission of a contract is impossible or impractical; nor does it suggest that the contractual management fee is sought in the alternative to benefit-of-the-bargain damages.

Should Plaintiff wish to seek leave to replead to address these deficiencies, Plaintiff shall file a letter, not to exceed three pages, by ten days from the date this opinion is filed, with an attached proposed Second Amended Complaint showing changes as compared with the operative Complaint. The letter shall explain why the amendment is sufficient and not futile. The Court

may "freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), but leave to amend "should generally be denied in instances of futility." *See United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (quotation marks omitted).  Defendant may file an opposition letter not to exceed three pages within one week after Plaintiff files any such letter and proposed amended complaint.

### c.  Statute of Limitations

The parties agree that, for the breach of contract claim to be timely, it must have accrued within six years of the Complaint being filed, *i.e.* June 21, 2013, or later.[5]  Because the Dividend Recap itself closed on June 28, 2013, it is not apparent from the "face of the complaint" that the claim is untimely, which would warrant dismissal on this ground.  *See Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) ("Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint.").

Defendant argues that it is not plausible that the Dividend Recap claim accrued only on the date of the transaction, given that Defendant would have been preparing and advising Atherotech for some time leading to that date.  But the Complaint does not describe these earlier actions, and Defendant's argument is therefore not apparent from the face of the complaint.

---

[5] The six-year statute of limitations is based on several statutes.  Under 11 U.S.C. § 108(a), a bankruptcy trustee must commence an action by the later of: (1) the expiration of an applicable limitations period or (2) two years after entry of order of relief, *i.e.* two years after the filing of a voluntary bankruptcy petition, which in this case ran by March 2018.  Therefore, the statute of limitations for a breach of contract claim applies here.  To determine that limitations period, the Court applies the choice-of-law rules of the forum state.  *See AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018).  New York law in turn provides that the claim must be timely under the shorter of: (1) New York's statute of limitations or (2) the statute of limitations where the cause of action accrued, which the parties agree is Alabama.  *See* N.Y. C.P.L.R. § 202.  Both New York and Alabama provide a six-year statute of limitations for contract claims.  *See* N.Y. C.P.L.R. § 213(2); Ala. Code. § 6-2-34(4).

15

Furthermore, Plaintiff suggests that it may rely on New York's continuing wrong doctrine, which tolls the statute of limitations period "until the date of the commission of the last wrongful act" -- *i.e.* the closing of the Dividend Recap -- "where there is a series of continuing wrongs." *See Henry v. Bank of Am.*, 147 A.D.3d 599, 601, 48 N.Y.S.3d 67, 70 (1st Dep't 2017). Defendant's own argument suggests that this doctrine may apply, because it characterizes Defendant as continually steering Atherotech toward the Dividend Recap through a series of actions. The parties do not raise whether a comparable doctrine exists under Alabama law. The statute of limitations defense is rejected at this stage.

### B.   Remaining Claims

The remaining theories for the breach of contract claim -- based on Defendant's recommended growth strategy and Defendant's failure to devise a contingency plan for the period after Atherotech stopped paying P&H fees -- are dismissed.

As to growth strategy, the Complaint fails to allege how Defendant's advice constituted willful misconduct or gross negligence. The nub of the Complaint's theory is that Defendant should not have advised Atherotech to increase direct sales to physicians. In doing so, Defendant effectively advised Atherotech to build an illegal business model dependent on the payment of the illegal fees. But the Complaint does not bear out this theory. At the time Defendant became an advisor in 2011, Atherotech had already resumed paying P&H Fees on its own since 2009, two years earlier. Furthermore, the Special Fraud Alert was not released until 2014, three years after Defendant allegedly pushed Atherotech to adopt the growth strategy. Had the illegality been clear cut, then the Special Fraud Alert, which clarified how laws applied to practices like P&H Fees, would not have been necessary. Furthermore, the Complaint alleges that it was the industry practice before the Special Fraud Alert to pay these fees. These

16

allegations fail to show how Defendant's advice to Atherotech to continue an ongoing common practice constituted willful misconduct or gross negligence.

As to Defendant's failure to prepare a contingency plan, this claim is dismissed because it is not anchored to any contractual provision.  To the contrary, the Agreement expressly provides that Defendant cannot be liable for *not* providing advice:  Defendant "reserves the right at any time not to provide services" enumerated under the Agreement.  The Agreement describes services Defendant may provide but does not require Defendant to provide any particular service.

## IV.    CONCLUSION

For the foregoing reasons, the motion is GRANTED.  Plaintiff may seek leave to replead to the limited extent described above.  The Clerk of Court is respectfully directed to close Dkt. No. 24.


Dated: April 23, 2020
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

17